1
2
3
4
5
6

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

7

MARCUS WHYBARK, an individual,

8                                   Plaintiff,

9    v.

10

11   CARL D. WHALEN, an individual,
     and KENNETH P. FREDERICKSEN,
12   an individual

13                                  Defendants.

No.

COMPLAINT

(JURY DEMAND)

14

15                          **<u>INTRODUCTION</u>**

16      1.      On the evening of July 9, 2023, shortly before 7:00 p.m., two Snohomish County

17   Sheriff's deputies repeatedly shot Marcus J. Whybark in front of his home in Sultan, Washington.

18   They wounded him grievously and nearly killed him.

19      2.      Without warning or justification, the officers unleashed a barrage of gunfire at Mr.

20   Whybark from close range with their .45 and 9mm handguns. When they shot him, Mr. Whybark

21   was unarmed, seated on the bed of a pickup truck, and perched in a defensive posture with his hands

22   covering his head. He presented no immediate threat to the officers or anyone else. This slow-

23   motion footage from an officer's body worn camera shows the officers shooting Mr. Whybark in

24
25   rapid succession, seeking to end his life: **https://whybark2023.wistia.com/medias/cjnup52fml.**

26

BUDGE&HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

3.     The two sheriff's deputies are Defendants Carl D. Whalen and Kenneth P. Fredericksen. Their grossly unlawful use of deadly force was captured on camera and is further detailed below.

4.     Although Mr. Whybark miraculously survived, he sustained serious injuries: multiple penetrating gunshot wounds to his arm, pelvis, torso, and both legs as well as a grazing gunshot wound to his head, other physical injuries, and severe psychological trauma.

5.     This federal civil rights lawsuit seeks to hold Defendants Whalen and Fredericksen accountable for their egregious, unnecessary, reckless, and blatantly unconstitutional use of deadly force.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over Plaintiff's civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a).

7.     Venue is proper in this forum under 28 U.S.C. § 1391(b) because all the events that support Plaintiff's allegations occurred in this judicial district and because the Defendants reside in this judicial district.

## PARTIES

8.     Plaintiff Marcus Whybark is an individual who resides in Washington State and lives in the City of Sultan in Snohomish County.

9.     Defendant Carl D. Whalen is an individual residing in this judicial district. At all relevant times, Defendant Whalen was a Snohomish County deputy sheriff acting within the course and scope of his employment. All acts and omissions of Defendant Whalen alleged in this complaint

COMPLAINT - 2

were done under color of state law in his capacity as a law enforcement officer for Snohomish County.

10.     Defendant Kenneth P. Fredericksen is an individual residing in this judicial district. At all relevant times, Defendant Fredericksen was a Snohomish County deputy sheriff acting within the course and scope of his employment. All acts and omissions of Defendant Fredericksen alleged in this complaint were done under color of state law in his capacity as a law enforcement officer for Snohomish County.

## FACTUAL ALLEGATIONS

### A.     Background Facts

11.     Sultan is a small city of approximately 5,000 people located in Snohomish County about 23 miles east of Everett. Sultan does not have an active police force of its own. Instead, it contracts with Snohomish County to provide law enforcement services in the city. Pursuant to this contract, the Snohomish County Sheriff's Office provides traditional law enforcement activities within the city limits of Sultan through its employed sheriff's deputies.

12.     Marcus Whybark, now 45 years old, grew up in Sultan and is a long-time resident of the community. He owns his own home, located at 308 2nd Street in a quiet residential neighborhood in Sultan. Gainfully employed for most of his adult life with two loving children and no significant criminal history, he has also long struggled with an addiction to alcohol. He is an alcoholic.

13.     The events in this case took place on a summer evening, July 9, 2023. Earlier that day, Mr. Whybark spent the afternoon at an outdoor music performance in town a few blocks away from where he lived. Mr. Whybark was with his companion, Loretta Nichols, who had been

COMPLAINT - 3

performing at the event. The two returned to Mr. Whybark's home in the late afternoon or early evening.

14.    Consistent with his alcohol addiction, Mr. Whybark drank alcohol in the days before July 9th. However, he was attempting to abstain from alcohol on July 9th and had not consumed any alcohol that day. Further, although Mr. Whybark has struggled with methamphetamine use during his adult life and had used methamphetamine in previous days, he had not used methamphetamine on July 9th.

15.    Shortly after returning home in the late afternoon or early evening of July 9th, Mr. Whybark began to experience a mental health episode (possibly brought on by the effects of alcohol withdrawal) that caused him to feel confused, disoriented, and anxious. Mr. Whybark began walking around the house saying nonsensical things and expressing irrational concerns about the safety of the house. At some point, he picked up a knife. He did not hurt Ms. Nichols with the knife or threaten to do so, but she became concerned about his strange behavior, left the house, and went outside.

16.    Parked on the street just outside Mr. Whybark's home were two pickup trucks. One truck, which was larger and dark blue, was a GMC truck that belonged to Mr. Whybark. The second truck, which was smaller and light blue, was a Ford Ranger. The light-blue Ford Ranger was parked directly in front of Mr. Whybark's truck. It belonged to Ms. Nichols.

17.    At about the same time Ms. Nichols walked outside, Mr. Whybark also left the home and walked outside. Ms. Nichols got into her truck. Mr. Whybark began to meander about on the lawn, sidewalk, and street in front of his home periodically talking to Ms. Nichols who was now seated in her truck. Mr. Whybark was holding the knife as he meandered.

COMPLAINT - 4

18.     Mr. Whybark was wearing shorts and a T-shirt. It was light outside and the temperature was warm. Mr. Whybark's dog stayed close by his side as he ambled around the yard, sidewalk, and street.

19.     Mr. Whybark continued to pace around outside his house with no apparent purpose, periodically talking to Ms. Nichols who was still seated inside her truck. Mr. Whybark was acting strangely and was still holding the knife but did not hurt or threaten to hurt anyone.

20.     At approximately 6:40 p.m., a neighbor came down the street riding his bicycle. The neighbor was an older gentleman wearing a ball cap and suspenders. He and Mr. Whybark had known each other for many years. The man saw that Mr. Whybark was acting strangely and holding a knife and decided to stop his bicycle near Mr. Whybark to talk with him and ask whether he was alright. The man got off the bicycle. Ms. Nichols had been seated in her truck, but she also got out and stood by her truck as Mr. Whybark and the man interacted in the street. The man had never seen Mr. Whybark act this way before and was concerned about his strange behavior.

21.     Things became somewhat tense: Mr. Whybark and the man engaged in a brief physical tussle, which lasted a very short time. Mr. Whybark did not hurt the man or attempt to do so. After this momentary exchange, the man walked away, uninjured. He walked back down the street, about twenty yards away from where Mr. Whybark was standing. Mr. Whybark remained in the street in the location (in front of his house) where he had been standing and previously pacing around.

22.     Still standing many feet away from Mr. Whybark, the man calmly called 911 to report the interaction. The call resulted in two Snohomish County Sheriff's deputies coming to the location.

COMPLAINT - 5

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

**B.    Defendant Fredericksen Arrives**

23.    Defendant Fredericksen was the first to arrive. Defendant Fredericksen was a relatively new officer who had been employed by the Snohomish County Sheriff's Office for about 16 months and who had graduated from the Washington State Basic Law Enforcement Academy about 11 months earlier. He drove his patrol vehicle to the scene.

24.    Defendant Fredericksen arrived at about 6:50 p.m. and parked his patrol vehicle in the street about 25 yards (75 feet) from where Mr. Whybark was standing. He got out of his patrol car.

25.    The neighbor stood some distance away with his hand on his hip looking on. Ms. Nichols got back in her truck and remained seated inside. Defendant Fredericksen withdrew his handgun and held it near his chest. He activated his body worn camera. This screenshot shows Defendant Fredericksen's perspective as he looked down the street at Mr. Whybark shortly after arriving at the location:



COMPLAINT - 6

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA  98102
TELEPHONE:  (206) 624-3060

26.     Defendant Fredericksen saw that Mr. Whybark was standing in the street near a bicycle that was lying in the road with his hands in the air. He saw that Mr. Whybark was not actively committing any crime. He could also see that there were no other people within Mr. Whybark's immediate vicinity. He knew there was a woman in the light blue Ford Ranger pickup, and he briefly spoke with the neighbor (standing to his right) who was looking on. He saw that the man was clearly uninjured, calm, and in no apparent distress. The man told Defendant Fredericksen that the person in the street was Marcus Whybark.

27.     Defendant Fredericksen could see there was a knife lying on the street a few feet to the left of where Mr. Whybark was standing. Mr. Whybark was standing in the middle of the street doing nothing imminently threatening. It was clear, however, that Mr. Whybark was confused and having a mental health episode of some sort. Indeed, according to Defendant Fredericksen, he heard Mr. Whybark "rambling about something that made no sense" and "making rambling noises with his mouth and not speaking." According to Defendant Fredericksen, he "believed" that Mr. Whybark was "under the influence of a narcotic."

28.     For about 90 seconds, Defendant Fredericksen did a commendable job talking to Mr. Whybark from his distant position. He calmly told Mr. Whybark to "come this way," "come talk to me," "step away from the knife," and gave him various other directives. Mr. Whybark did not follow Defendant Fredericksen's directives, but nor did he make any threatening gesture or motion. Mr. Whybark basically just stood in the street. The situation was relatively calm, and no one was in any immediate danger. Defendant Fredericksen announced on his radio that "the knife is on the ground."

COMPLAINT - 7

**C.    Defendant Whalen Arrives**

29.    Defendant Whalen, having activated his body worn camera, arrived at the location just before 6:53 p.m. Defendant Whalen had over 15 years of law enforcement experience. He had been promoted to sergeant approximately one year before this incident and was thus the superior officer on the scene.

30.    Before Defendant Whalen reached the scene, he knew, per his own admission, that the knife was "out of play." And when Defendant Whalen arrived in his patrol car, he could see (just as Defendant Fredericksen could see) that Mr. Whybark was standing far away from Defendant Fredericksen and that there were no people standing within his immediate vicinity. He saw that Defendant Fredericksen's car was parked and that Defendant Fredericksen was talking to Mr. Whybark. Defendant Whalen could see that no person was being threatened, no crime was being committed, and there was no immediate danger to anyone. Defendant Whalen saw that Mr. Whybark was not holding any weapon and knew the knife was down on the ground. He also knew that Defendant Fredericksen had, to that point, been simply talking to Mr. Whybark from his distant position, trying to avoid any escalation of the situation—just as a prudent police officer should do when interacting with a person in crisis.

31.    Indeed, when Defendant Whalen first arrived, Mr. Whybark was simply standing in the street, unarmed, distant from any other person, with his hands on his head. This screenshot shows Defendant Whalen's perspective as he looked down the street at Mr. Whybark when he first arrived:

COMPLAINT - 8

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE:  (206) 624-3060



**D.      Defendant Whalen Unjustifiably Escalates**

32.      Prudent police procedure at this point would have been for Defendant Whalen to take up a position near Defendant Fredericksen and proceed calmly, deliberately, and thoughtfully. Given that Mr. Whybark posed no immediate threat to anyone, a reasonable officer would have taken the time to learn more about the situation and assess how it might be resolved peacefully. There was no pressing need to do otherwise. Both officers had their service weapons and less lethal weapons available if Mr. Whybark attempted to do anything threatening or harmful.

33.      But instead of proceeding calmly, deliberately and thinkingly, Defendant Whalen did the exact opposite. He immediately jumped out of his patrol car. He then aggressively, unnecessarily, and unreasonably *escalated* the situation by drawing his taser and marching towards Mr. Whybark at a rapid clip, pointing his weapon at Mr. Whybark while simultaneously shouting commands even though he knew (or should have known) that the person he was shouting at was mentally confused.

COMPLAINT - 9

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA  98102
TELEPHONE:  (206) 624-3060

34.     Within a second of exiting his patrol vehicle, and even though Mr. Whybark *wasn't even holding the knife*, Defendant Whalen loudly barked: "PUT IT DOWN NOW! DO YOU UNDERTAND ME, GET ON THE GROUND!"

35.     Defendant Whalen gave Mr. Whybark no time to process his command or to get on the ground as ordered. Instead, taser drawn and pointed at Mr. Whybark, Defendant Whalen marched towards him and closed the gap between himself and Mr. Whybark in a few seconds. Then he immediately tased Mr. Whybark, causing him to collapse to the ground near the open door of his pickup truck.

36.     Mr. Whybark's dog was, at this time, sitting in the passenger seat of Mr. Whybark's truck. As a natural reaction to someone violently assaulting her owner, the dog came out of the truck and began barking at Defendant Whalen. Defendant Whalen dropped his taser, drew his .45 caliber handgun, and immediately shot the dog dead as shown here:



BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

**E.      The Unlawful Shooting of Mr. Whybark**

37.      Mr. Whybark was shocked, confused, and scared for his life. Though he had been merely standing in the street moments before, he had just been violently tased and his dog had been shot before his very eyes. Mr. Whybark got off the ground and turned his back to Defendant Whalen as shown here:



38.      Scared for his life, Mr. Whybark tried to run away from the hyper-aggressive Defendant Whalen as shown here:

COMPLAINT - 11



39.     Mr. Whybark was so frightened he didn't know what to do. Ahead of him was the light-blue Ford Ranger pickup belonging to Ms. Nichols. Behind him was the officer who had just tased him and killed his dog. In a desperate bid to escape Defendant Whalen's unwarranted aggression, Mr. Whybark leaped onto the hard composite cover of the Ford Ranger pickup, put his right hand on the pickup bed cover, and exposed his left hand into the air as shown here:

COMPLAINT - 12

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE:  (206) 624-3060



40. As mentioned earlier, Ms. Nichols was seated inside the light-blue pickup truck upon which Mr. Whybark was now sitting. The two defendants knew she was seated inside. Both defendants now had their guns drawn and pointed at Mr. Whybark—with Ms. Nichols *directly in their line of fire*. This closeup shows the same moment in time as the previous screenshot with Ms. Nichols's head clearly visible in the back window of her pickup:

COMPLAINT - 13

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060



41.     Mr. Whybark sat down on the pickup bed cover. And at that very moment, one of the defendants fired the first shot at Mr. Whybark (and in the direction of Ms. Nichols) as shown here:

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA  98102
TELEPHONE:  (206) 624-3060



42.    Hearing the first shot ring out, Mr. Whybark instinctively went into a defensive posture to protect his head as shown here:

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

43.     Mr. Whybark then covered his whole head with his arms and hands, and tried to bury his chin in his chest as shown here:



44.     While Mr. Whybark was seated in the position depicted above, hopelessly trying to protect himself, with arms and hands covering his head and his chin buried in his chest, completely unarmed and incapable of hurting anyone, both defendants unleashed a barrage of gunfire at him.

45.     As he was seated in the position shown above, the defendants shot him at least four more times. This slow-motion video from Defendant Whalen's body camera shows the moment the defendants shot Mr. Whybark repeatedly, in quick succession, as he was seated in the defensive posture shown in the image above: **https://whybark2023.wistia.com/medias/9ysmk0zvav**

46.     The shots hit Mr. Whybark in the legs, arm, pelvis, torso, and head and dropped him like a sack of rocks to the hard pavement below:

COMPLAINT - 16



47.     Aid workers arrived, and emergently transported Mr. Whybark to Providence Hospital in Everett for care and treatment for his multiple gunshot wounds.

**F.    Videos of the Shooting**

48.     As mentioned above, the shooting and the events leading up to the shooting were captured on video. This includes body worn camera footage from Defendants Fredericksen and Whalen. It also includes video surveillance footage from a neighbor's Ring security camera positioned across the street looking in the direction of the events.

49.     The following real-time video footage is from Defendant Fredericksen's body worn camera. It captures the events from Defendant Fredericksen's perspective from the moment he activated his body worn camera through the time Defendant Whalen arrived and escalated the situation, and through the time the two defendants repeatedly shot Mr. Whybark. It is 2 minutes

COMPLAINT - 17

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA  98102
TELEPHONE:  (206) 624-3060

and 8 seconds long. The events it depicts are incorporated into this Complaint in full. The video is viewable here: **https://whybark2023.wistia.com/medias/obltsn9qpt**

50.     The following real-time video footage is from Defendant Whalen's body worn camera. It captures the events from Defendant Whalen's perspective from the moment he arrived on the scene and through the time the two defendants repeatedly shot Mr. Whybark. It is 46 seconds long and the depicted events are incorporated into this Complaint in full. The video is viewable here: **https://whybark2023.wistia.com/medias/9we1a3ihfj**

51.     The following real-time video footage is from a Ring surveillance camera from a neighbor's house across the street. It captures the events from the moment the two defendants marched towards Mr. Whybark through the time they repeatedly shot him. It is 28 seconds long and the depicted events are incorporated into this Complaint in full. The video is viewable here: **https://whybark2023.wistia.com/medias/4id76w1j3p**

**G.     Defendants' False Statements Following the Shooting**

52.     After the shooting, both defendants made several demonstrably false statements about what occurred leading up to and surrounding the shooting.

53.     For his part, Defendant Fredericksen gave a written statement at the direction of then-Snohomish County Sheriff Adam Fortney. In his initialed and signed statement, which he purported to be "true," Defendant Fredericksen claimed, among other things, that after Mr. Whybark's dog was shot, Mr. Whybark got onto the covered bed of the light-blue pickup truck and lay "prone on his stomach," while "screaming" and "trying to stab the window on the passenger side of the [pickup] with the knife." He claimed that Mr. Whybark "was trying to jam the knife into the window of the [pickup] as if he were trying to break the window." He claimed that Mr. Whybark "spent about 10-15 seconds" "trying to break the window with the knife." He claimed that Mr.

BUDGE⊕HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA  98102
TELEPHONE:  (206) 624-3060

Whybark "was "staring" at him and Defendant Whalen as a "pre-attack indicator" and "was about to push himself off" the truck and that he was "trying to actively harm people with the knife" when he was shot. And he claimed that after getting on the pickup bed, Mr. Whybark "rear[ed] his right hand back down to his hip area and thrust the knife over his head like a haymaker punch into the back of the [pickup's] rear window." These statements are demonstrably false. They are contradicted by the clear video evidence. Defendant Fredericksen knowingly made these false statements in an effort to justify his unlawful use of deadly force.

54.    For his part, Defendant Whalen also gave a written statement at the direction of then-Snohomish County Sheriff Adam Fortney. In his initialed and signed statement, which he purported to be "true," Defendant Whalen claimed, among other things, that when he arrived on the scene, Mr. Whybark was "pacing back and forth in the street." He claimed that Mr. Whybark "posed an immediate threat to others." He originally claimed, before reviewing the video, that he "fired four or five rounds" at Mr. Whybark before he got onto the bed of the pickup truck after which time Mr. Whybark "got down onto the ground into the street," and said "something similar to the fact he was done." These statements are demonstrably false and contradicted by clear video evidence. Defendant Whalen acknowledged elsewhere in his statement that after reviewing the video footage, his "recollection was inaccurate." Moreover, shortly after the shooting, when supervising officers asked him about (1) the direction of the shots fired and (2) the trail of blood left by the dog he shot and killed, Defendant Whalen gave untrue answers, captured on other segments of body-worn camera footage. Specifically, footage shows Defendant Whalen pointing in an entirely different direction than the real shooting when asked which direction the shots were fired. And when asked about a trail of blood leading up to Mr. Whybark's house, which had been

COMPLAINT - 19

left by the mortally wounded dog retreating to her home, Defendant Whalen stated that the blood was "unrelated to my incident" and had been there previously.

**H.     The Defendants' Use of Deadly Force was Unconstitutional and Otherwise Unlawful**

55.     The defendants' use of deadly force was unreasonable and grossly excessive in violation of Mr. Whybark's well-established Fourth Amendment right to be free from excessive force.

56.     In shooting Mr. Whybark, the defendants acted intentionally, knowingly, recklessly, and/or maliciously in violation of Mr. Whybark's well-established rights under the Fourth Amendment to be free from excessive force.

57.     In shooting Mr. Whybark, the defendants assaulted Mr. Whybark without justification in violation of his rights under Washington law.

58.     In shooting Mr. Whybark, the defendants committed battery against Mr. Whybark without justification in violation of his rights under Washington law.

59.     In shooting Mr. Whybark, the defendants' conduct was intentional, extreme, and outrageous and caused physical harm and emotional distress to Mr. Whybark. The defendants committed the tort of outrage against Mr. Whybark in violation of his rights under Washington law.

**I.     Mr. Whybark's Damages**

60.     The Defendants' conduct caused Mr. Whybark to sustain significant injuries and damages, including physical pain, internal and external injuries to his body, psychological trauma, extreme emotional distress, disability, disfigurement, and loss of enjoyment of life. Mr. Whybark has suffered these damages since the date of the shooting, and he will continue to suffer them in the future.

COMPLAINT - 20

61.     In addition, the officers' conduct caused Mr. Whybark to sustain economic losses. These include medical bills and other bills and expenses associated with his treatment and attempts at recovery, as well as future care needs and costs associated with his physical and psychological injuries and disabilities. Although Mr. Whybark also sustained damages in the form of lost earnings, he is waiving that specific element of economic damages for purposes of this lawsuit.

**J.     Possibility of Amending Complaint to Add Snohomish County as an Additional Defendant**

62.     Discovery in this matter will include discovery directed not only to Defendants Fredericksen and Whalen, but also to their employer, Snohomish County. Discovery may include, *inter alia*, requests to produce various documents and materials relating to the training, supervision, and employment of Defendants Fredericksen and Whalen. Discovery may also include requests to produce all documents and materials relating to previous uses of force or the ratification thereof.

63.     While it is anticipated that the production of information generally described in the foregoing paragraph will be relevant to the claims asserted against Defendants Fredericksen and Whalen, the discovery may also result in Plaintiff amending this Complaint to assert a *Monell* cause of action against Snohomish County.

## CLAIMS AGAINST DEFENDANTS

64.     Defendants Fredericksen and Whalen are liable under 42 U.S.C. § 1983 for using excessive force against Mr. Whybark in violation of his rights under the Fourth Amendment to the United States Constitution.

65.     Defendants Fredericksen and Whalen are liable under Washington law for torts of assault, battery, and outrage.

## JURY DEMAND

66.     Plaintiff demands that this matter be tried by a jury.

COMPLAINT - 21

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 East Roy Street
SEATTLE, WA 98102
TELEPHONE:  (206) 624-3060

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff prays that the Court award:

A.      Compensatory damages in an amount to be proven at trial, sufficient to compensate Mr. Whybark for his general damages under federal and state law including, but not limited to, damages for his physical pain, psychological trauma, emotional distress, disability, disfigurement, and loss of enjoyment of life, both past and future.

B.      Compensatory damages in an amount to be proven at trial, sufficient to compensate Mr. Whybark for his economic losses for medical bills and other bills and expenses associated with his treatment and attempts at recovery, as well as his future care needs and other future costs associated with his physical and psychological injuries and disabilities.

C.      Punitive damages under federal law, in an amount to be proven at trial.

D.      Attorneys' fees, costs, and prejudgment interest incurred in pursuing this action as provided for in 42 U.S.C. § 1988; and

E.      Any such other relief that this Court deems just and equitable under the circumstances of this case.

DATED this 20th day of May, 2024.

*/s/ Edwin S. Budge*
Edwin S. Budge, WSBA #24182
Erik J. Heipt, WSBA #28113
Andrea R. Woods, WSBA #48265
Budge & Heipt, P.L.L.C.
808 E. Roy St.
Seattle, WA 98102
Attorneys for Plaintiff

COMPLAINT - 22